**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

TIMOTHY W. MARTIN, Individually,
as Heir at Law and Representative of the Estate
of TIMOTHY MICHAEL MARTIN, Deceased,
and on behalf of all wrongful death beneficiaries,

Plaintiff,

CIVIL NO. 6:26-cv-00340-JDK

v.

JURY TRIAL DEMANDED

CITY OF LONGVIEW, TEXAS; ANTHONY BOONE, individually; CODY SPRAYBERRY, individually; RYAN ROCKETT, individually; STEVEN BURT, individually; LESLIE SHERIDAN, individually; DENNIS PHILLIPS, individually; KERRY HIGGINBOTHAM, individually; and Texas Ranger MYKEL GOLDEN, individually,

Defendants.

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Timothy W. Martin, individually and as father, heir at law, and representative of the Estate of Timothy Michael Martin, deceased, and on behalf of all wrongful death beneficiaries, files this First Amended Complaint under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments, and alleges as follows.

## I. NATURE OF THE ACTION

1. Timothy Michael Martin ("Tim") died on July 18, 2024, in Longview, Texas, after Longview police responded to a report that his disabled recreational vehicle was parked at a gas station. Over roughly five hours, and with no violent act by Tim, officers immobilized and

surrounded the RV, discharged seven CS gas munitions into the enclosed, unventilated vehicle while he was inside, and—after their own drone showed him face down and unresponsive—deployed more gas and waited one hour and forty-three minutes before entering. No officer summoned or rendered medical aid. Tim died.

## II. PARTIES, JURISDICTION, AND VENUE

2. Plaintiff Timothy W. Martin, a Florida resident, is the father and heir at law of Timothy Michael Martin, deceased, and sues individually, as representative of the Estate, and on behalf of all statutory wrongful death beneficiaries.

3. Defendant City of Longview, Texas (the "City") is a Texas municipal corporation in Gregg County. The Longview Police Department ("LPD") is a department of the City, and the acts of its officers are attributable to the City. The City may be served through its City Manager or Mayor at 300 W. Cotton Street, Longview, Texas 75601.

4. Defendant Anthony Boone ("Chief Boone") is the Chief of Police and, at all relevant times, the City's final policymaker for law-enforcement policy, training, supervision, and discipline. He is sued individually.\

5. The following Longview officers are each sued individually and may be served at 518 W. South Street, Longview, Texas 75601: Cody Sprayberry, an officer and certified crisis negotiator; Ryan Rockett ("Lt. Rockett"), a lieutenant, SWAT Commander, and the on-scene incident commander; Steven Burt ("Sgt. Burt"), a sergeant and SWAT team leader; Leslie Sheridan, an officer and SWAT chemical-munitions operator; Dennis Phillips ("Sgt. Phillips"), a sergeant and SWAT team leader; and Kerry Higginbotham ("Lt. Higginbotham"), a lieutenant who served as an on-scene supervisor and personally operated the drone flown into the RV.

6. Defendant Mykel Golden ("Ranger Golden") is a Texas Ranger employed by the Texas Department of Public Safety, sued individually. He may be served at the Gregg County Courthouse, 101 E. Methvin, Suite 559, Longview, Texas 75601.

7. Each individual Defendant acted under color of state law within the meaning of 42 U.S.C. § 1983.

8. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events occurred in Gregg County, which lies in the Tyler Division. 28 U.S.C. § 124(c)(1). This action was filed on July 14, 2026, within two years of Tim's death. Damages are measured by the Texas Wrongful Death and Survival Statutes, Tex. Civ. Prac. & Rem. Code §§ 71.002, 71.021, and 71.009, which federal law adopts for § 1983 death cases under 42 U.S.C. § 1988. No claim is brought under the Texas Tort Claims Act.

## III. FACTUAL ALLEGATIONS

9. Tim was a professional tattoo artist who lived and worked in a converted school bus outfitted as a recreational vehicle (the "RV"). Near the end of a multi-state tour, the RV broke down in Longview and could travel no faster than about 15 to 20 miles per hour, a limitation later confirmed by a diesel repair shop.

10. Tim parked in the RV area beside the dump station of the CEFCO gas station at 306 South Eastman Road, Longview, awaiting a 9:00 a.m. repair appointment on July 18, 2024, at Pliler International Diesel, about two miles away. He blocked no lane or access point, had no criminal record, and post-mortem testing showed no illegal drugs in his system.

11. At approximately 3:17 a.m., officers were dispatched about the parked RV. The offense, if any, was at most misdemeanor criminal trespass, for which a citation could have issued.

12. Tim displayed no weapon and threatened no specific person.

13. Officer Sprayberry claims he glimpsed what he believed to be a revolver handle in Tim's waistband. He drew his own firearm and gave orders before any threatening movement. Tim never drew, displayed, pointed, or fired any weapon; he retreated to the back of the bus because he told officers he was exhausted and needed sleep.

14. As a certified crisis negotiator, Sprayberry conducted a negotiation with Tim by telephone lasting at least an hour and a half. He used another officer's personal cell phone rather than a department phone and did not ensure his body-worn camera captured the calls; no audio recording of the negotiation exists.

15. By Sprayberry's own account, Tim's speech was slurred, he repeatedly drifted off to sleep mid-sentence, he said he would leave at 9:00 a.m. when the repair shop opened, and he "gave [Sprayberry] no indication that he wanted to commit any self-harm or that he wanted to harm anyone else." Sprayberry also spoke with Tim's father, who reported that Tim had no history of violence, that a prior encounter had produced negative drug and alcohol testing, and that medical staff had attributed Tim's fatigue to a condition affecting long-haul drivers deprived of rest and food.

16. Police escalated the situation by immobilizing and surrounding the RV. They flattened its tires, placed wheel chocks against the tires, stretched a spike strip between the rear wheels, ringed it with police vehicles, and positioned a Lenco "BearCat" armored vehicle nose-to-nose against it, which they used to bump and rock it. Once immobilized, Tim could neither drive away nor comply with commands to move the RV, and he could not leave on foot except into the drawn firearms surrounding him. Tim was seized within the meaning of the Fourth Amendment.

17. Lt. Rockett arrived at approximately 4:00 a.m. as SWAT Commander. By his own account, Tim had then committed no violent act, fired no weapon, and made no specific threat against any identifiable person.

18. At 6:19 a.m., Longview communications advised Rockett that Tim's father had convinced Tim to put his gun down and surrender; Officer Manion's report states that Tim "had dismantled his firearm, had put it on the seat and was planning on coming out." Rather than stand down, officers moved to take Tim by force. At approximately 6:28 a.m., while his father believed Tim was surrendering, Tim stopped responding on the phone without disconnecting. His father called back 77 times; Tim never answered again.

19. At 6:37–6:38 a.m., members of the team heard a sound from the bus and debated whether it was a gunshot. No officer investigated, made a welfare check, or attempted renewed contact. Instead, officers completed the immobilization of the vehicle, treating a possible medical emergency as a containment problem. Every act officers took afterward was premised on Tim being alive: they loud-hailed, bumped the bus with the BearCat, and then deployed chemical agent "in attempts to get the subject to leave via the front door of the bus."

20. At 7:07 a.m., Rockett called out the full SWAT team; by 7:55 a.m. all SWAT personnel and the BearCat had arrived. At 8:04 a.m., the BearCat moved nose-to-nose and bumped the bus, with no response. At 8:09 a.m., Rockett decided "to transition to a gas plan."

21. At 8:11–8:12 a.m., on a cue relayed by Sgt. Phillips, Officer Sheridan fired six 40mm Ferret CS rounds through the rear windows of the enclosed bus. The manufacturer warns that the product "MAY CAUSE SERIOUS INJURY OR DEATH," that directly firing the Ferret round at an individual "CAN CAUSE DEATH OR SERIOUS BODILY INJURY," and that indoor discharge requires ventilation. The RV had no mechanical or exhaust ventilation; the only openings were

those officers created or used. By the officers' own accounts, the agent remained so concentrated that they could not at first enter until fans ventilated it, and a crime-scene investigator still needed a fan to process the interior the next day.

22. At 8:21 a.m., Lt. Higginbotham flew a drone through the open driver's window. At 8:26 a.m., the drone showed Tim slumped face down in the center aisle, unresponsive. Officers observed that he appeared to be trying to breathe through a floor vent "to escape the effects of the gas" and that "no blood or injuries could be seen." One minute later, at 8:27 a.m., officers' hand-deployed a Flameless Tri-Chamber CS canister—the most concentrated munition used that day—into the enclosed space "to saturate the bus even further."

23. When the drone showed Tim unresponsive at 8:26 a.m., his serious medical need was obvious. Defendants had deployed the gas to incapacitate him, knew the munitions carried the manufacturer's death warnings, knew the quantity discharged into an enclosed space, knew of Tim's exhausted condition, and had earlier debated whether they heard a gunshot. No aid was summoned, no breach was made, and no medic approached. By Rockett's own report, "the gas was given time to work," and the team waited for a search warrant; Rockett wrote that the lack of response "led [him] to believe that the subject had taken his own life."

24. At 10:05 a.m., the drone found Tim in the same position, apparently not breathing. At 10:09 a.m.—one hour and forty-three minutes after the drone first showed him unresponsive—officers breached the RV. Sgt. Burt found no heartbeat. Justice of the Peace Robby Cox pronounced death at 12:23 p.m. The only medic on scene, a Longview Fire Department paramedic assigned to the SWAT team, spent the operation driving the BearCat for the chemical-munitions team; no ambulance was staged and no medical plan existed for the man being gassed.

25. No officer faced a split-second judgment. Every decision—the immobilization, the SWAT call-out, the gas plan, the second gassing, and the choice to wait for a warrant—was deliberate and made over a period of hours.

26. The conduct of each individual officer is established by Defendants' own reports. Lt. Rockett commanded each escalation, made the 8:09 a.m. decision to introduce gas, authorized or permitted the 8:27 a.m. Tri-Chamber deployment against a man he knew to be unresponsive, and chose to wait for a warrant rather than summon aid. Sgt. Phillips led the chemical-munitions team, relayed the deployment command, chose the windows through which rounds were fired, repositioned the BearCat, and participated in deploying the Tri-Chamber canister after the drone showed Tim down. Officer Sheridan personally deployed every round—the six Ferret rounds and the hand-deployed Tri-Chamber canister—the last after being told Tim was on the floor "attempting to breathe through a drain hole in the floor." Sgt. Burt planned and executed the immobilization, observed each deployment, treated the 6:38 a.m. sound as a containment problem, and led the 10:09 a.m. entry, summoning no aid. Officer Sprayberry knew more about Tim's condition than any officer—no threats, no violence, no record, extreme exhaustion, and no intent to harm anyone—yet conducted the negotiation on an unrecorded personal phone, remained on scene throughout the escalation, and neither interceded nor reported what he knew. Lt. Higginbotham, who operated the drone, had the clearest view of Tim's condition, saw him unresponsive at 8:26 a.m. and again at 10:05 a.m., and during the intervening period neither stopped the additional gas nor summoned aid.

27. An autopsy performed on July 19, 2024, by Dr. Lisa M. Barton, a forensic pathologist in Mesquite, Texas, states that Tim died of a contact entrance wound to the right lateral head and classifies the manner of death as suicide. The autopsy neither tested for nor addressed CS gas and

was rendered without any CS toxicology, any gunshot-residue result from Tim's bagged hands, or any ballistics comparison. Dr. Barton was not told that at least seven CS munitions had been discharged into the enclosed vehicle, that a drone had shown Tim alive and struggling to breathe after six of them, or that he had been reported surrendering minutes before he fell silent.

28. Ranger Golden was the only non-medical person present at the autopsy and the only source of case information to Dr. Barton. Her report recites a "reported history of mental health disease" that no medical record supports and that, upon information and belief, originated with law enforcement and is false. The report also notes aspirated gastric contents in the upper airways, consistent with asphyxial distress. Dr. Barton expressly reserved the right to amend her opinion if additional objective, probative information became available; counsel invoked that reservation by letter dated July 6, 2026, and no response had been received as of filing.

29. At 8:26 a.m., after six Ferret rounds, Defendants' own drone showed Tim alive—possibly breathing, seeking air at a floor vent, and without visible injury. Whatever the 6:37 a.m. sound was, it was not an immediately fatal gunshot wound, because two hours later the man Defendants were watching was breathing. Plaintiff pleads, in the alternative under Federal Rule of Civil Procedure 8(d)(2), that Tim (a) died from the toxic effects of massive CS exposure in an enclosed space; (b) was so incapacitated by the gas and exhaustion that he lacked capacity to form a knowing, intentional decision to take his own life, such that any self-inflicted act was the direct and foreseeable product of Defendants' unconstitutional force; or (c) sustained a wound survivable with prompt care and died because Defendants summoned no aid for one hour and forty-three minutes. The suicide classification, rendered on an incomplete record, does not establish that Tim took his own life, and Plaintiff does not so allege.

30. Ranger Golden took control of the crime scene and the investigation, and Longview refuses to release his report. Detectives possessed a Leica RTC360 three-dimensional scanner but scanned only the exterior, stating they lacked clearance from the Texas Ranger to enter; the interior volume of the RV is the measurement required to establish the concentration of CS agent inside it. Upon information and belief, Ranger Golden took sole, undocumented custody of the projectile recovered at the autopsy for approximately ten months, and no ballistics or gunshot-residue results have been disclosed. The Heritage Rough Rider .22 revolver was never assigned a scene evidence number, packaged, or secured at the scene; it entered LPD's evidence system only on July 22, 2024, when Ranger Golden delivered it already sealed in a box (Tag #240002258, Item #11), and no record documents its condition or provenance before that delivery.

31. The body and the handgun were moved between the drone recording and the crime-scene photographs, during the period Ranger Golden controlled the scene, and no produced record documents who moved them, when, or why. Multiple officers' body-worn cameras were not activated during critical periods; the City withheld unredacted body-camera and drone footage for more than a year despite Plaintiff's Texas Public Information Act requests and payment of nearly $4,000; and the City refuses to release the recordings of Tim's call with dispatch.

32. The City's July 2026 production was curated and materially deficient: Tim's face was redacted in every image; one two-hour body-camera video shows only a wall and a patrol car with unintelligible audio; no footage of the gas deployments or the breach was produced; the reports reference 267 photographs while the production contains 343; and the drone videos, alone among the produced media, bear no timestamps.

33. The result is the permanent loss of evidence Plaintiff's claims require: the RV interior volume was never measured; no CS toxicology was performed and Tim has been cremated; the

chains of custody for the revolver and projectile were never created; the position of the body and weapon at death is unrecoverable; and Ranger Golden's report, the dispatch recordings, and the full autopsy file remain withheld. Plaintiff has paid nearly $4,000 under the Public Information Act and retained a forensic pathologist, a toxicologist, and a reconstruction firm to reconstruct what an honest investigation should have documented and has spent two years unable to learn how his son died.

34. Several facts contradict suicide. In the hours before his death, Tim purchased about $200 in groceries, had a Longview tattoo engagement booked for July 18, 2024, and had the 9:00 a.m. repair appointment; a witness confirmed the RV's mechanical problems. LPD's official public statement characterized Tim as "showing signs of a possible mental episode or possibly intoxicated." The laboratory results were negative for illegal drugs, no medical record supports any psychiatric condition, and the statement falsely attributed the "mental episode" report to a family member in Florida, though no family member made any such report.

35. Chief Boone is the City's final policymaker for law-enforcement policy, training, supervision, and discipline, as documented on the face of the Department's General Orders, each of which bears his review initials and issue authority. The General Orders contain no policy governing the deployment of CS-gas munitions. General Order 100.09 (Use of Force), bearing Chief Boone's review initials dated September 8, 2023, was in force on July 18, 2024, and contains no CS-munitions provision; General Order 100.13 addresses impact projectiles only. No City policy addressed the deployment of CS munitions into enclosed, occupied, unventilated spaces; maximum quantities or concentrations; the manufacturer's ventilation requirement; the staging of emergency medical services before chemical operations; the monitoring or rescue of an exposed subject who becomes unresponsive; or post-exposure medical care.

36. The City deliberately chose to purchase and issue Ferret CS rounds and Tri-Chamber CS grenades bearing the manufacturer's death warnings, for use in barricade operations that predictably involve persons confined in enclosed spaces, while adopting no policy and providing no training on those hazards. Upon information and belief, the Department's chemical-munitions training was limited to the manufacturer's operator certification and included no instruction on concentration in enclosed spaces, ventilation, medical staging, or rescue of an unresponsive subject.

37. The City maintains formal discipline (General Order 300.19) and internal-investigation (General Order 300.21) procedures, which Chief Boone controls. In the more than two years since Tim's death, and upon information and belief, no officer has been disciplined or retrained, no internal-affairs investigation has been opened, no CS-deployment policy has been adopted, and every involved officer remains in the same or a promoted assignment. Chief Boone published, and has never corrected, the false public account of Tim's death. His failure to investigate, discipline, retrain, or change policy after an operation of this magnitude, together with his public defense of it, ratified the officers' conduct and reflects a preexisting policy of impunity.

## IV. CAUSES OF ACTION

### COUNT I — Excessive Force in Violation of the Fourth Amendment (42 U.S.C. § 1983)

### (Against Rockett, Sheridan, Phillips, and Burt)

38. Plaintiff incorporates the preceding paragraphs. The Fourth Amendment, applied to the States through the Fourteenth, protects against unreasonable seizures, including objectively unreasonable force, judged by the severity of the crime, the immediacy of any threat, and whether the person was actively resisting or fleeing, and the totality of the circumstances.

39. Every relevant factor favored Tim: the offense was at most a citation-eligible misdemeanor; he posed no immediate threat, committed no violent act, and fired no weapon; and he could not resist or flee because Defendants had disabled and surrounded the RV. Firing seven chemical munitions bearing manufacturer death warnings into an enclosed, unventilated, occupied vehicle was force carrying a substantial risk of death, applied against a man who threatened no one. The 8:27 a.m. Tri-Chamber deployment is independently unreasonable: by then Defendants had seen Tim face down, unresponsive, and struggling to breathe, and deploying the most concentrated munition of the day to "saturate the bus even further" around an incapacitated man served no legitimate objective.

40. Defendants had hours to deliberate and never faced a split-second judgment. Rockett, Sheridan, Phillips, and Burt each personally directed, deployed, or executed this force, deliberately and in conscious disregard of a known and substantial risk of death. As a direct and proximate result, Tim suffered conscious pain, asphyxial distress, incapacitation, and death, and Plaintiff is entitled to compensatory and punitive damages and attorneys' fees under 42 U.S.C. § 1988.

**COUNT II — Denial of Medical Care in Violation of the Fourteenth Amendment, and in the Alternative the Fourth Amendment (42 U.S.C. § 1983) (Against Rockett, Sheridan, Phillips, and Burt)**

41. Plaintiff incorporates the preceding paragraphs. Once Defendants immobilized, surrounded, and then incapacitated Tim by force applied for that purpose, they restrained his liberty and owed him the medical care owed to a person in custody; in the alternative, their failure to render or summon aid rendered the seizure unreasonable in the manner of its execution under the Fourth Amendment.

42. By 8:26 a.m., Defendants knew Tim was face down, unresponsive, and possibly fighting to breathe, following their deployment of munitions warned to cause death and hours after they had debated whether they heard a gunshot. His serious medical need was so apparent that even a layman would recognize it. Their response was to deploy more gas at 8:27 a.m. and then wait one hour and forty-three minutes for a search warrant, summoning no emergency medical services, staging no rescue, and rendering no care while a SWAT medic remained on scene. Each Defendant was aware of the substantial risk and consciously disregarded it; no warrant is required for an emergency rescue entry, and officers close enough to place a canister through a window by hand were close enough to open the door.

43. As a direct and proximate result, Tim suffered prolonged conscious suffering and death, and Plaintiff is entitled to compensatory and punitive damages.

**COUNT III — Failure to Intervene / Bystander Liability (42 U.S.C. § 1983) (Against Sprayberry, and Against Rockett, Burt, and Phillips as to force deployed by others)**

44. Plaintiff incorporates the preceding paragraphs. An officer who knows a fellow officer is violating an individual's constitutional rights, is present, has a reasonable opportunity to prevent the harm, and fails to act, is liable for failure to intervene.

45. Sprayberry knew from ninety minutes of negotiation and from Tim's father that Tim posed no threat and was incapable of compliance yet watched the escalation from seizure to chemical munitions over a period of hours and neither interceded nor reported it. Rockett, Burt, and Phillips each observed every deployment, including the Tri-Chamber deployment against a man they knew to be unresponsive, with full knowledge and ample opportunity to stop it, and did nothing. As a direct and proximate result, Tim suffered injury and death, and Plaintiff is entitled to compensatory and punitive damages.

**COUNT IV — Failure to Intervene, Denial of Medical Care, and On-Scene Supervisory Liability (42 U.S.C. § 1983) (Against Higginbotham)**

46. . Plaintiff incorporates the preceding paragraphs. Higginbotham observed, through the drone he operated and in his supervisory role, the escalating deployment of chemical munitions against a man he knew to be unresponsive and non-threatening, and neither interceded nor reported it. He had the clearest view of Tim's serious medical need of any officer and was actually aware of it; he summoned no aid, directed no rescue, and—though he held supervisory authority—ensured no care of any kind during the one hour and forty-three minutes between his two drone observations. That deliberate indifference was a moving force behind the additional gassing and the fatal denial of care.

47. As a direct and proximate result of Higginbotham's conduct, Tim suffered prolonged conscious suffering and death, and Plaintiff is entitled to compensatory and punitive damages against Higginbotham individually.

**COUNT V — Municipal Liability (42 U.S.C. § 1983) (Against the City of Longview)**

48. Plaintiff incorporates the preceding paragraphs. Chief Boone is the City's final policymaker for use of force, training, and discipline, as documented on the face of the Department's General Orders.

49. The City made a deliberate policy choice to arm its SWAT officers with CS munitions bearing the manufacturer's death warnings while adopting no policy governing their use in enclosed, occupied spaces, no limit on quantity or concentration, no ventilation requirement, no medical-staging requirement, and no monitoring or rescue protocol. A use-of-force policy that comprehensively regulates every other force option while leaving the deadliest chemical munitions unregulated reflects deliberate indifference to known and obvious consequences. The failure to

train these officers on the lethal hazard of CS concentration in enclosed spaces was likewise deliberate indifference to an obvious need, and deploying that untrained capability in barricade operations that predictably involve enclosed occupied spaces carried the highly predictable consequence of death.

50. Chief Boone further ratified the conduct: after an operation of this magnitude he opened no investigation of conduct involving serious bodily injury or death, imposed no discipline, adopted no policy, and publicly defended the officers while publishing a false account of the death—supporting the inference of a preexisting custom of impunity. Each policy, custom, and failure alleged was a moving force behind the violation of Tim's Fourth and Fourteenth Amendment rights and his death. The City is liable for compensatory damages; no punitive damages are sought against the City.

**COUNT VI — Supervisory Liability: Failure to Train, Supervise, and Discipline (42 U.S.C. § 1983) (Against Chief Boone, Individually)**

51. Plaintiff incorporates the preceding paragraphs. Chief Boone promulgates, reviews, and updates the Department's General Orders and is responsible for the training, supervision, and discipline of every sworn officer, including each Defendant.

52. Chief Boone armed his officers with CS munitions the manufacturer warns may cause death and adopted no policy and provided no training on their use in enclosed, occupied spaces, their quantity or concentration, ventilation, medical staging, or the monitoring and rescue of an exposed subject. The need for that training was obvious and the inadequacy likely to result in death; his failure was deliberate indifference. He likewise maintains the Department's discipline and internal-investigation machinery and, upon information and belief, invoked none of it after his officers gassed a non-violent misdemeanant to death. These failures were a direct and

proximate cause of the violation of Tim's rights and of his death, and Plaintiff is entitled to compensatory and punitive damages against Chief Boone individually.

**COUNT VII — Conspiracy to Violate Civil Rights (42 U.S.C. § 1983) (Against Golden, Boone, Rockett, Burt, Phillips, Sheridan, Sprayberry, and Higginbotham)**

53. Plaintiff incorporates the preceding paragraphs. A § 1983 conspiracy requires an agreement involving state action and an actual deprivation of rights in furtherance of the agreement; the agreement may be tacit and inferred from concerted conduct. Because Ranger Golden is employed by a separate sovereign entity, the intracorporate-conspiracy doctrine does not bar these allegations.

54. Before any force was used, and in coordination, the certified crisis negotiator conducted the entire negotiation on a personal, unrecorded phone; multiple officers left their body-worn cameras inactivated during a fatal, hours-long operation contrary to policy; and the officers in direct contact with Tim recorded none of it—supporting the inference of a prior agreement to proceed without a record. Ranger Golden joined the agreement when he took control of the scene: he denied clearance for the interior scan that would quantify the CS concentration; served as the sole conduit of information to the medical examiner while omitting the CS munitions, the drone observations, and the surrender report and supplying an unsupported psychiatric history; and took sole, undocumented custody of the revolver and projectile. On May 22, 2025 Golden stated that the matter was a **questionable death.** Chief Boone, with authority over the Department's records and public statements, withheld the objective record, caused a curated production, published a false public narrative, and opened no internal investigation.

55. These acts, attributed to the Defendant responsible for each, were undertaken in furtherance of a tacit agreement to conceal the circumstances of Tim's death and to immunize the involved

officers from discipline, prosecution, and civil liability. As a direct and proximate result, the Longview Defendants deprived Tim of his Fourth and Fourteenth Amendment rights, and all Defendants named in this Count deprived Plaintiff of his own right of access to the courts as alleged in Count VIII. Plaintiff is entitled to compensatory and punitive damages.

**COUNT VIII — Denial of Access to the Courts (42 U.S.C. § 1983) (Plaintiff Timothy W. Martin Individually, Against Golden and Boone)**

56. Plaintiff incorporates the preceding paragraphs. Plaintiff brings this Count in his individual capacity for the violation of his own right of access to the courts, which is violated when state officials intentionally conceal information crucial to a person's ability to obtain redress, for the purpose of frustrating that right, and the concealment substantially reduces the likelihood of obtaining relief otherwise available. This is a backward-looking claim: Plaintiff does not allege he was prevented from filing suit, but that the concealment has impaired his ability to obtain redress on the underlying claims in Counts I through IV.

57. Ranger Golden denied clearance for the interior scan that would have fixed the RV's volume; withheld from the forensic pathologist the seven CS munitions, the drone observations, and the surrender report while supplying a false psychiatric history; took sole, undocumented custody of the revolver and projectile; and controlled the scene during the undocumented movement of the body and weapon for which he claimed the death was questionable contradicting suicide. Chief Boone withheld the objective record for more than a year despite statutory requests and payment, caused a curated and incomplete production, published a false account of the death, and opened no internal investigation. Defendants acted to frustrate Plaintiff's right of redress, and their concealment has caused irreversible harm: the RV volume cannot now be measured; no CS toxicology can now be performed; the chains of custody were never created; and the position of

the body and weapon at death is unrecoverable—conditions that substantially reduce the likelihood that Plaintiff will obtain the relief otherwise available on Counts I through IV.

58. This relief is available in no other suit: neither Golden nor Boone is a defendant on Counts I through IV, and Texas recognizes no independent action for spoliation. The claim accrued no earlier than July 2026, when the City's production first disclosed the denial of clearance, the undocumented custody, and the discrepancies between the drone footage and the scene photographs. As a direct and proximate result, Plaintiff has suffered damages in his own right—the loss of evidence, the expense of Public Information Act requests and retained experts, two years of delay, and emotional distress—and is entitled to compensatory and punitive damages against Golden and Boone individually, with attorneys' fees under 42 U.S.C. § 1988.

**COUNT IX — Wrongful Death and Survival Damages (Tex. Civ. Prac. & Rem. Code §§ 71.002, 71.021, 71.009) (Against All Defendants)**

59. Plaintiff incorporates the preceding paragraphs. This Count states no independent theory of liability; it identifies the measure of damages that federal law adopts under 42 U.S.C. § 1988 for the constitutional violations pleaded in Counts I through VII, and the capacities in which Plaintiff recovers them. Under the Texas Wrongful Death Act, § 71.002, Plaintiff and the statutory beneficiaries are entitled to pecuniary loss, mental anguish, and loss of companionship and society. Under the Texas Survival Statute, § 71.021, all causes of action Tim possessed survive to his Estate, including his conscious pain, suffering, and mental anguish between the first CS deployment and his death. The individual Defendants acted with reckless and callous indifference to Tim's federally protected rights, entitling Plaintiff to exemplary damages against the individual Defendants under § 71.009. No punitive damages are sought against the City.

## V. DAMAGES

60. As a direct, proximate, and producing cause of the conduct alleged, Plaintiff seeks: (a) Tim's conscious pain, suffering, and mental anguish from the first CS deployment until death; (b) loss of enjoyment of life; (c) loss of earning capacity; (d) funeral and burial expenses; (e) Plaintiff's pecuniary loss; (f) Plaintiff's mental anguish, grief, and loss of companionship and society, past and future; (g) exemplary and punitive damages against the individual Defendants; (h) Plaintiff's individual damages for the denial of his right of access to the courts; and (i) reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 1988.

## VI. JURY DEMAND

61. Plaintiff demands a trial by jury on all issues so triable.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that Defendants be cited to appear and answer, and that upon final trial the Court and jury: (a) award compensatory damages against all Defendants, jointly and severally, in an amount to be determined by the jury; (b) award exemplary and punitive damages against Defendants Boone, Sprayberry, Rockett, Burt, Sheridan, Phillips, Higginbotham, and Golden, including damages against Golden and Boone individually on Count VIII; (c) award reasonable attorneys' fees, expert witness fees, and costs under 42 U.S.C. § 1988; (d) award pre- and post-judgment interest at the maximum lawful rate; and (e) grant such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

*/s/ Lamar Treadwell*
Lamar D. Treadwell, Lead Trial Counsel
TBN: 20205000
1308 E. Common St., Suite 205
New Braunfels, Texas 78132
PH: (505) 660-0602
E-Fax: (505) 213-0094
Lamar@treadwelltriallaw.com

SMITH AND VINSON LAW FIRM, PLLC
*/s/ Jarrod Smith*
Jarrod L. Smith
TBN: 24094095
jarrod@smithandvinson.com
1411 West Avenue, #124
Austin, Texas 78701
PH: (512) 368-9044

SMITH AND SMITH ADVOCATES, PLLC
*/s/ Elise Smith*
Elise Smith
MBN: 0505942
elise@smithandsmithadvocates.com
3503 Wild Cherry Dr.
Building 11, Suite 1A
Lakeway, Texas 78738
PH: (512) 638-8582

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

62. I certify that on October 1, 2026 a true and correct copy of the foregoing was filed through the CM/ECF system on this date, which will serve notice on all counsel of record.

*/s/ Lamar Treadwell*
Lamar Treadwell